Brett John Prendergast, ATTORNEY AT LAW, 4603 South Carrollton Avenue, New Orleans, LA 70119, COUNSEL FOR PLAINTIFF/APPELLANT
Elizabeth Robins, DEPUTY CITY ATTORNEY, Corwin M. St. Raymond, ASSISTANT CITY ATTORNEY, Sunni J. LeBeouf, CITY ATTORNEY, 1300 Perdido Street, Room 5E03, New Orleans, LA 70112, COUNSEL FOR DEFENDANT/APPELLEE
(Court composed of Judge Roland L. Belsome, Judge Joy Cossich Lobrano, Judge Regina Bartholomew-Woods )
These consolidated appeals challenge various final decisions of the New Orleans Civil Service Commission, the review of which this Court possesses jurisdiction pursuant to La.Const. art. X, section 12. For the reasons that follow, we reverse the decision of the Civil Service Commission, and order that Ms. Edmonds be reinstated to her former position as Parking Administrator.
PROCEDURAL BACKGROUND
Zepporiah Edmonds was a long-time employee of the City of New Orleans ("the City") Department of Public Works ("DPW"). In 2006, Ms. Edmonds was promoted to the classified position of Parking *786 Administrator, and held that position at all times relevant to the instant appeals. In September and October of 2015, Ms. Edmonds filed two appeals with the City's Civil Service Commission ("the Commission"). The first appeal was filed in response to a letter concerning a pre-termination hearing, and the second was filed in response to a notice of emergency suspension.
On January 11, 2016, Ms. Edmonds was terminated by DPW's Director, Colonel Mark Jernigan. DPW alleged four bases for her termination. However, these appeals concern only one basis, that being her alleged failure to cooperate with an investigation initiated by the City's Office of the Inspector General ("OIG"). Ms. Edmonds also appealed her termination to the Commission in February of 2016.
A hearing examiner for the Commission heard testimony over a period of nine (9) days between April 21, 2016, and March 13, 2017. On August 2, 2017, the hearing examiner rendered a written report concluding "that the DPW failed to prove by a preponderance of evidence that [Ms. Edmonds'] emergency suspension and termination were for cause."
On September 5, 2017, the Commission rendered its decision finding that Ms. Edmonds "did engage in misconduct" regarding the OIG investigation, but that "such misconduct did not warrant termination."[1] However, the Commission found "[t]here was nothing in the record to assist the Commission in determining what an appropriate level of discipline would be in the matter now before us." The Commission therefore remanded the matter back to the hearing examiner to determine the appropriate level of discipline.
Upon remand, a hearing was conducted and the hearing examiner issued a report, describing the parties as having provided "no assistance whatsoever in determining what the appropriate level of discipline should be in accordance with the Commission's mandate." A review of the hearing transcript indicates that the parties did indeed simply rehash the merits of their cases, though DPW suggested a 166-day suspension would be appropriate, along with demotion.[2] However, the examiner concluded that an appropriate penalty could be recommended based on the record and his personal experience, with reference to the New Orleans Police Department Penalty Matrix. The hearing examiner accordingly recommended a one-day suspension.
On November 16, 2017, the Commission rendered a 2-1 decision. The majority declined to follow the recommendation of the hearing examiner. However, the Commission agreed several mitigating factors existed, to wit: a lack of prior discipline during Ms. Edmond's thirty-two (32) year career at DPW; her prior cooperation with OIG investigations; her "serious personal illness;" and indications that she had been "overwhelmed" by her workload during the relevant period. Nonetheless, the Commission reaffirmed its position that Ms. Edmonds' engaged in "serious misconduct" and accordingly found "involuntary demotion to a lower classification" to be an appropriate penalty. The Commission ordered DPW to reinstate Ms. Edmonds to the position of Assistant Parking Administrator "at a step that would result in no *787 greater than a $3,000/yr. reduction in salary." The Commission reasoned that such reduction would be equivalent to a sixty-day unpaid suspension. DPW was also instructed to remit all back pay and emoluments consistent with her reclassification dating back to January 11, 2016. The dissenting commissioner would have simply imposed a sixty-day unpaid suspension.
Both Ms. Edmonds and DPW have appealed the decisions of the Commission. Specifically, Ms. Edmonds seeks review of the Commission's September 5, 2017 decision finding she engaged in misconduct warranting discipline with respect to the OIG investigation, arguing the Commission "manifestly erred" in making several findings. She further appeals her demotion, arguing such discipline is not commensurate with the conduct in question. DPW also appeals the Commission's decision regarding Ms. Edmonds' discipline, suggesting that its decision to terminate was indeed warranted. Ms. Edmonds' also appeals the Commission's denials of her motions to reconsider its decisions.
FACTUAL BACKGROUND
The OIG investigation in question commenced in 2014, a time at which the OIG was conducting a number of investigations into the Parking Division. In summary, the OIG sought to determine whether certain Parking Control Officers ("PCOs") had issued citations to patrons and employees of hotels in retaliation against those hotels after being asked to leave the establishments for loitering. OIG Investigator Eddie Hernandez first met with Ms. Edmonds on August 11, 2014. Ms. Edmonds and Mr. Hernandez had differing accounts of exactly what occurred during this initial meeting. It is unclear exactly what Mr. Hernandez requested at that time because he did not put anything into a formal written document. The Commission's September 5, 2017 ruling even stated that it was "surprised that Mr. Hernandez did not make his original request for information in writing." Ms. Edmonds did testify that Mr. Hernandez "scribbled some stuff on the back of a piece of paper" that did not concern the retaliatory actions of the PCOs, and it is not clear if the list was given to her or retained by Mr. Hernandez. She also stated "[h]e couldn't even find the paper. That's why he sent me an email[,]" referring to a December 18, 2014 e-mail requesting she send a copy of the list of items he requested. Mr. Hernandez confirmed this during his testimony. Mr. Hernandez also testified that he asked his supervisor whether he needed to type anything up for the meeting and was told that it was not necessary. Apparently, as a result of Ms. Edmonds' perceived lack of cooperation, the OIG has instituted a "Zepporiah Rule" now requiring all requests be put in writing for record purposes.
The Commission was presented with texts exchanged between Ms. Edmonds and Mr. Hernandez, specifically one sent to Ms. Edmonds on September 17, 2014, asking if "the items" were ready to be picked up. Ms. Edmonds responded with a time at which Mr. Hernandez could stop by the office, but she was unable to fulfill the commitment because she was at Tulane Hospital for an unspecified reason. Communications continued into November, when Ms. Edmonds indicated her absence from work "until further notice" due to an illness. She also conveyed her understanding that Mr. Hernandez was working with Sherida Emery in her absence. Mr. Hernandez replied that he had contacted Ms. Emery, but that Ms. Emery had not responded. Ms. Edmonds responded that she was chagrined at her office's lack of response, but added that Ms. Emery was "overwhelmed" and "working triple duty *788 which is causing her to be pulled in many different directions."
Ms. Emery testified that she worked to fulfill Mr. Hernandez's requests while Ms. Edmonds' dealt with her illness, though she did not possess the same authority as Ms. Edmonds and therefore was unable to make a request of Xerox for the records in question. As a result, she contacted Xerox and obtained contact information for an individual named Brett Peze, who could provide Mr. Hernandez with the information he needed. Later in the hearings, Richard Boseman, Administrator for the Hearing Center and Parking Administrator, testified that he was familiar with the capabilities of the Xerox system used by DPW, and that any reports such as that requested by Mr. Hernandez would need to be requested directly from Xerox.
The Commission also reviewed several other e-mails. The first, the e-mail from Mr. Hernandez on December 18, 2014, requested Ms. Edmonds provide "a copy [of] the list of items that I requested that we discussed earlier this year." The Commission interpreted the e-mail to suggest that Mr. Hernandez did not recall what information he had initially requested in the August, 2014 meeting. In the second e-mail, Ms. Edmonds contacted Mr. Hernandez again on February 13, 2015, responding to his February 9, 2015 follow-up to an e-mail he had sent earlier that year. The Commission described the latter e-mail, sent January 12, 2015, as "far more indicative of the types of inquiries the Commission has reviewed as part of an OIG investigation." She apologized for the delay, indicating a misunderstanding on her part, as she believed an answer had been provided earlier. She also indicated that she was in the midst of organizing for the upcoming Mardi Gras holiday, yet she provided written answers to the numerous questions posed by Mr. Hernandez. Her e-mail indicated that the Parking Division was transitioning from Xerox to Duncan Solutions as its vendor, and confirmed that an individual named Brett Peze would be the appropriate contact person for tickets issued prior to the transition. Ms. Edmonds added in her response her understanding that "[y]ou [Mr. Hernandez] agreed to contact Mr. Peze directly." Notably, she made this statement in response to his question "Is Brett Peze the best person for me to speak with concerning the tickets [prior to DPW's transition from Xerox to Duncan]?" She also explained that when the Parking Division used Xerox, a specific request had to be made to "the Project Manager" for reports indicating which tickets were written in a particular geographic area. She also informed Mr. Hernandez that Xerox could not provide GPS data, nor did the phones provided to PCOs have GPS functionality at the relevant time.
Mr. Hernandez did contact Mr. Peze at Xerox, who indicated that the data could indeed be provided, but that no one from the Parking Department had ever made such a request. By the time the OIG made its own request, on March 25, 2015, Mr. Hernandez testified it was his understanding that the information had been transferred to Duncan Solutions and would be prohibitively expensive for Xerox to recreate. Howard Schwartz, the Assistant Inspector General for Investigations, testified that by the time OIG contacted Xerox itself, Xerox was still capable of producing what was needed, but that "it wasn't worth putting the resources in" given the time and cost. He further testified that "[w]e could have gotten those records from where they were archived [at Duncan Solutions] at a later date ... [but] I didn't think it was worth the resources to do it at that time." When asked about the accompanying costs, Mr. Schwartz stated, "I don't remember the numbers, but to me it *789 was not worth going to get those at a year, year and a half later."
Mr. Hernandez testified that Ms. Edmonds was generally cooperative in his investigations aside from the investigation into retaliatory tickets issued by PCOs. He was of the understanding that DPW "didn't have the database" with the information he required, but that Xerox did. He stated there would be a "large expense" associated with recreating the information at Xerox, as the information had been transferred to Duncan. He suggested that Ms. Edmonds had been intentionally uncooperative, noting "five to six months" of delay between their initial meeting and when he received some responsive information.
Ms. Edmonds testified over several days during the hearings. In pertinent part, she testified it was never her "charge" to contact Mr. Peze at Xerox, referring to the e-mail indicating that Mr. Hernandez had agreed to do so. She also testified to having told Mr. Hernandez that her office lacked the resources and staff to manually search for the ticket information because the office was "in transition" with its vendors. She stated her office could not personally access Xerox's data as a result of the transition, and that to obtain it required "an additional cost." She also explained that even though DPW extended its contract with Xerox through the end of August 2014, the extension did not permit DPW to go in and "operate their system." She explained the records were only provided in a "read only" format.
The OIG released its report on June 17, 2015, and relative to PCO misconduct, indicated that it was unable to determine whether retaliatory tickets had been issued due to lack of required documentation. Colonel Mark Jernigan, Director of the DPW and the individual who terminated Ms. Edmonds, testified that he "relied on the OIG report" as the basis for her termination.
The Commission recognized that it would be "unreasonable" to expect an immediate response from Ms. Edmonds regarding the inquiry, but also noted that Mr. Hernandez's "polite inquiries" did not sufficiently prompt Ms. Edmonds' "focus on production." The Commission did acknowledge Ms. Edmonds' busy work schedule and illness contributed to the delays, but that those issues "did not relieve the DPW or the Parking Division of the responsibility to respond to the various requests for information." To the extent Ms. Edmonds' delegated authority in her absence, the Commission took the position that she "did a poor job of following through on this delegation and did not closely monitor Ms. Emery's response."
The Commission found that Ms. Edmonds should have started the process of either manually gathering the required information or contacting Xerox in August 2014. It expressly stated that her failure to do so was not "intentional or purposefully designed to thwart the OIG's investigation[,]" but it nonetheless constituted a "failure to take appropriate action" and "hindered the OIG's investigation into PCO misconduct."
STANDARD OF REVIEW
The appointing authority in this matter, DPW, required cause to discipline Ms. Edmonds for the conduct in question. La.Const. art. X, section 8 (A).[3] "A classified employee subjected to such disciplinary action shall have the right of appeal to the appropriate commission pursuant to *790 Section 12 of this Part.[4 ] The burden of proof on appeal, as to the facts, shall be on the appointing authority." Id.
This Court, in Waguespack v. Dep't of Police , 2012-1691, pp. 3-4 (La.App. 4 Cir. 6/26/13), 119 So.3d 976, 977-78, discussed the appellate standard of review applicable to a decision of the Commission:
The decision of the Civil Service Commission is subject to review on any question of law or fact upon appeal to this Court, and this Court may only review findings of fact using the manifestly erroneous/clearly wrong standard of review. La. Const. art. X, § 12 (B); Cure, 07-0166, p. 2, 964 So.2d at 1094. In determining whether the disciplinary action was based on good cause and whether the punishment is commensurate with the infraction, this Court should not modify the Civil Service Commission determination unless it is arbitrary, capricious, or characterized by an abuse of discretion. Id. A decision by the Civil Service Commission is "arbitrary or capricious" if there is no rational basis for the action taken by the Civil Service Commission. Cure, 07-0166, p. 2, 964 So.2d at 1095. The appointing authority has the burden of proving, by a preponderance of the evidence, that the complained of activity or dereliction occurred, and that such dereliction bore a real and substantial relationship to the efficient operation of the appointing authority. Cure, 07-0166, p. 2, 964 So.2d [at] 1094, citing Marziale [v. Department of Police], 06-0459, at p. 10 [ (La.App. 4 Cir. 11/8/06) ], 944 So.2d [760] at 767.
Furthermore, this Court stated in Stokes v. Code Enf't & Hearing Bureau , 2013-0203, p. 4 (La.App. 4 Cir. 10/2/13), 126 So.3d 590, 593 :
When there is a conflict in testimony, reasonable evaluations of credibility and reasonable evaluations of fact should not be disturbed on review, i.e. when there are two permissible views of evidence, the fact finder's choice cannot be manifestly erroneous. Saacks v. City of New Orleans, 95-2074 (La.App. 4 Cir. 11/27/96), 687 So.2d 432, 440.
ANALYSIS
This case is different from many of the cases that come before this Court on appeal from a decision of the Commission as a result of Ms. Edmonds' high rank within the DPW as Parking Administrator, below only Colonel Jernigan, he being the Director of the DPW. Thus, as such a high-ranking official, we are especially mindful of Ms. Edmonds' obligation to ensure the "efficient operation" of her division within the DPW. Had PCOs retaliated against local businesses, the DPW's efficient operation would surely be affected. The question for this court is whether Ms. Edmonds herself committed an infraction related to such incidents, and whether good cause existed based upon the proven infraction to sanction her.
There is no doubt that Ms. Edmonds, as the head of the Parking Division, was obligated to cooperate with the investigation conducted by the OIG. "All officers and *791 employees of covered agencies shall extend full cooperation and all reasonable assistance to the inspector general." La.R.S. 49:220.24(E).
In Honore' v. Dep't of Pub. Works , 2014-0986, pp. 16-17 (La.App. 4 Cir. 10/29/15), 178 So.3d 1120, 1131, this Court discussed termination as follows:
Termination from permanent employment is the most extreme form of disciplinary action that can be taken against a city employee. Hills v. New Orleans City Council, 98-1101, p. 6 (La.App. 4 Cir. 12/09/98), 725 So.2d 55, 58. Cause that may justify some other lesser form of disciplinary action may not necessarily justify a dismissal. Dept. of Public Safety and Corrections, Office of State Police v. Mensman, 95-1950, p. 4 (La.4/8/96), 671 So.2d 319, 321. In reviewing the disciplinary action taken by the Appointing Authority, "the Commission must consider whether the punishment was commensurate with the proven infractions under the circumstances." Id., 95-1950, p. 5, 671 So.2d at 322. The nature of the offense in question is one factor to be considered by the Commission when determining whether the punishment imposed is commensurate with the offense. Other factors to be considered include the employee's work ethic, prior disciplinary records, job evaluations, and any grievances filed by the employee. See Hills, 98-1101, p. 6, 725 So.2d at 58.
Using Honore as a guide, we agree with the Commission's finding that termination was not appropriate under the circumstances. However, we find that the Commission manifestly erred in finding that DPW proved by a preponderance of the evidence that Ms. Edmonds engaged in any activity or conduct detrimental to the efficient operation of DPW. Accordingly, we additionally find the imposition of any discipline unjustified.
The Nature of the Alleged Offense
It is undisputed that the OIG did not obtain the documentation it needed to determine whether PCOs had acted in a retaliatory fashion. Much as Ms. Edmonds and her division had an obligation to cooperate with the OIG, OIG was duty bound to "do all things necessary to carry out [its] functions." La.R.S. 49:220.24(M). We note that Mr. Hernandez did not formally put any request in writing until months after the initial August meeting. While Ms. Edmonds had responded in a cooperative fashion after August, there appeared to be confusion regarding the exact information being requested, as Mr. Hernandez contacted Ms. Edmonds again in December, 2014 for "a copy [of] the list of items that I requested that we discussed earlier this year." Furthermore, during the period between the initial August 11, 2014 meeting and January 12, 2015 email, Ms. Edmonds was undergoing treatment for her illness, and had referred Mr. Hernandez to Ms. Emery, to whom she had delegated certain tasks in her absence. Ms. Emery provided Mr. Hernandez with the contact information for Brett Peze at Xerox, and she was of the understanding that Mr. Hernandez would be the one to contact Mr. Peze.
Upon receiving a follow-up e-mail on February 9, 2015, Ms. Edmonds responded to Mr. Hernandez's multiple inquiries, indicating, in writing, her understanding that he would contact Xerox himself. Mr. Hernandez apparently had no objection to this statement, only emailing Ms. Edmonds again on February 26, 2015, stating he needed "those reports we discussed" by March 6, 2015, in order to complete his own report. Despite this March 6th deadline, Mr. Hernandez did not contact Xerox until after that date.
*792 Indeed, the OIG itself had the ability to obtain the documentation in question. The Commission instead suggested that as of the August 11, 2014 meeting, there were only two options, both of which fell on Ms. Edmonds' shoulders, and both of which presumed that Mr. Hernandez clearly articulated both his requests and his expectations. First, she could have instructed her staff to manually look through the records. However, the Commission's report stated it "does not question" Ms. Edmonds' statements that such a task "would have consumed most, if not all, of [her] administrative resources." The DPW was indeed required to cooperate with OIG's investigation; however, the law also states that such cooperation extends to "reasonable assistance." We do not find it reasonable to expect that Ms. Edmonds would use "all" of her administrative resources for a single task related to a single OIG investigation, considering that several investigations were ongoing, and especially given the day-to-day obligations of the position and additional demands posed by the Division's transition from Xerox to Duncan. The second option put forward by the Commission would have required Ms. Edmonds to contact Xerox herself. While Ms. Edmonds could have done so, the record indicated, at a minimum, confusion regarding who would contact Xerox. Specifically, Mr. Hernandez failed to put his requests into a formal written document. Though not required-and notwithstanding the fact that he was specifically told such action was unnecessary by a supervisor-had such a document been provided, much of the ensuing confusion could have been mitigated or altogether eliminated.
Indeed, a third option existed. Ms. Edmonds' understanding, evidenced by her February 13, 2015 email, was that Mr. Hernandez would contact Xerox himself. Ms. Emery testified that as a result of Ms. Edmonds' absence from work during her illness, she took on the task of providing the relevant information to Mr. Hernandez, and she provided the contact information for Brett Peze at Xerox. Mr. Hernandez had the contact information for months, yet took no action to follow through with it. Even after receiving Ms. Edmonds' email in February which explicitly indicated that she had no intention of contacting Xerox because he had agreed to do so, Mr. Hernandez voiced no concern. Instead, he followed up with another email, stating he was "going to need those reports that we discussed no later than March 6, 2015." At a minimum, the record reflects a complete misunderstanding between the parties. While Mr. Hernandez was persistent in communicating his need, in very general terms for "items" or "reports," only Ms. Edmonds made it explicit, in writing, that she understood Mr. Hernandez would contact Xerox for the relevant information.
Other Factors Relevant to Discipline
We must not only consider the nature of the offense, but also other mitigating factors, some of which the Commission accounted. Honore also suggests that "the employee's work ethic, prior disciplinary records, job evaluations, and any grievances filed by the employee" be taken into consideration. On these counts, the Commission found no issues. Indeed, the Commission cited Ms. Edmonds' length of service with "overwhelmingly positive performance evaluations" without prior discipline as mitigating factors, as well as her previous cooperation with other OIG investigations.[5] Unlike DPW, we do find *793 these to be relevant mitigating factors. DPW suggests Ms. Edmonds' conduct called into question her competence and ability to fulfill her duties, while neglecting pertinent mitigating factors, to wit: Ms. Edmonds' chronic illness for which she was undergoing treatment at the relevant time, which caused her to miss significant time at work during the fall of 2014, at the very time Mr. Hernandez was conducting his investigation; the timing of the investigation during the Parking Division's transition from one ticket processing vendor to another, which limited the Parking Division's access to pertinent information; and OIG's failure to put its requests into writing from the outset of the investigation. DPW also suggests that the offense in question was so grave as to "overshadow" her otherwise unblemished thirty-two (32) year career of service with the DPW. However, this Court finds it difficult to reconcile such a statement with OIG's position that it was not "worth it" to obtain the documents in question itself despite an ability to do so, especially given Colonel Jernigan's seeming reliance on the report as the only basis for Ms. Edmonds' termination. The Commission itself concluded that "the OIG's decision not to expend additional resources to obtain the requested information suggests that the OIG did not view the information as vital to its investigation."
Termination
Considering the totality of the circumstances, this Court does not conclude that the Commission abused its discretion in declining to uphold the DPW's imposition of the "most extreme" form of discipline available. Indeed, termination has often been upheld in cases involving intentional and egregious conduct. Krupp v. Dep't of Fire , 2007-1260, pp. 10-11 (La.App. 4 Cir. 11/19/08), 995 So.2d 686, 693 (affirming termination for an employee who was untruthful and attempted to alter a positive drug test evidencing his recent use of cocaine); Williams v. Sewerage & Water Bd. , 2004-0025, p. 9 (La.App. 4 Cir. 5/19/04), 876 So.2d 117, 122 (affirming termination for employee who struck another in violation of appointing authority's zero-tolerance policy regarding workplace violence); Reynolds v. Dep't of Prop. Mgmt. , 577 So.2d 1026, 1027 (La.App. 4 Cir. 1991) (affirming termination for employee who "absented himself" from work for an entire week without notifying his supervisor, despite having been previously warned for similar conduct).
Other Discipline
We next turn to whether the Commission abused its discretion by demoting Ms. Edmonds to Assistant Parking Administrator with its resulting reduction in salary. We do conclude that the Commission abused its discretion in assessing any discipline at all for the very reasons already discussed. As stated in Honore , supra , discipline is justified when one engages in particular conduct detrimental to the appointing authority's efficient operation. The Commission's finding that Ms. Edmonds could have directed "all" of her administrative resources to the sole task of manually searching for all parking tickets goes beyond the "reasonable assistance" requirement of the law. Beyond a manual search, only Xerox could have provided the relevant information, and Ms. Edmonds gave Mr. Hernandez Xerox's contact information months before he ever attempted making contact, despite explicitly expressing her understanding that he would do so. At the time he did make contact, the information was still available, though at a cost that was never specified.
In demoting Ms. Edmonds, the Commission reasoned that she would "have less responsibilities [sic] and be better able to focus on specific tasks." We do not agree *794 with the Commission's assessment that this matter concerned a lack of focus. The statement itself relies on the premise that no misunderstanding existed between Ms. Edmonds and Mr. Hernandez, and that she simply did not get to the task of providing him with information. Based on our analysis of the facts, we do not find that to be the case. Ms. Edmonds held her position as Parking Administrator for eight (8) years without incident prior to the events giving rise this appeal, and the record does not indicate Ms. Edmonds is unable or unwilling to perform her duties as Administrator.
Accordingly, we find that the Commission correctly reversed the DPW's termination of Ms. Edmonds, but abused its discretion in assessing discipline in the form of a demotion. The Commission manifestly erred in finding that Ms. Edmonds' engaged in any conduct that was detrimental to the efficient operation of the DPW.
CONCLUSION
For the foregoing reasons, we reverse the Commission's ruling demoting Ms. Edmonds, and order that Ms. Edmonds be reinstated to her position as Parking Administrator, with all compensation and benefits consistent therewith, retroactive to the date of her termination.
REVERSED
LOBRANO, J., CONCURS IN THE RESULT AND ASSIGNS REASONS
LOBRANO, J., CONCURS IN THE RESULT AND ASSIGNS REASONS.
I respectfully concur. I agree with the majority's conclusion that the Civil Service Commission ("CSC") abused its discretion in disciplining Zepporiah Edmonds by imposing a demotion and that Edmonds should be reinstated to her former position as parking administrator with all back pay and emoluments. I find, however, that the CSC manifestly erred and was clearly wrong in finding that the Department of Public Works ("DPW") satisfied its burden of proving that legal cause existed for Edmonds' discipline.
An employer cannot subject a permanent classified civil service employee to disciplinary action except for legal cause expressed in writing. La. Const. Art. X, § 8 (A). To establish that it had legal cause, the appointing authority had the burden of proving two factors: (i) that the complained of conduct occurred, and (ii) that the complained of conduct impaired the efficiency of the department. Abbott v. New Orleans Police Dep't , 2014-0993, p. 9 (La. App. 4 Cir. 2/11/15), 165 So.3d 191, 198 (citations omitted). The decision of the CSC "is subject to review on any question of law or fact upon appeal to this Court, and this Court may only review findings of fact using the manifestly erroneous/clearly wrong standard of review." Cure v. Dep't of Police , 2007-0166, p. 2 (La. App. 4 Cir. 8/1/07), 964 So.2d 1093, 1094 (citing La. Const. art. X, § 12 ). "In determining whether the disciplinary action was based on good cause and whether the punishment is commensurate with the infraction, this Court should not modify the CSC order unless it was arbitrary, capricious, or characterized by an abuse of discretion." Id. , 2007-0166, p. 2, 964 So.2d at 1094-95.
The record reflects that the hearing examiner, after hearing evidence and taking testimony in this matter, concluded and recommended to the CSC that DPW failed to prove legal cause for discipline by a preponderance of the evidence. The CSC, however, rejected the hearing examiner's recommendation. In his report, the hearing examiner noted OIG investigator Eduardo Hernandez's testimony that he merely scribbled notes on a scrap of paper, *795 which he did not retain, and could not recall with particularity what documents he had requested of Edmonds. Thereafter, Edmonds took extended sick leave. Edmonds' supervisor, DPW Director, Col. Jernigan specifically testified that Edmonds was not allowed to work from home or direct other employees while out on sick leave. Edmonds, nevertheless, assigned another employee, Sherida Emery, to assist Hernandez in her absence. Emery told Hernandez that she could not provide him with the disputed documents and provided Hernandez with the names and contact information for Xerox employees to assist him.
I cannot reconcile this testimony with the CSC's conclusion that Edmonds "did fail to fully and expediently cooperate with Mr. Hernandez regarding the OIG's investigation." The CSC's finding is manifestly erroneous.

Notably, DPW alleged several bases for Ms. Edmonds' termination; however, the Commission found it had only met its burden with respect to her failure to cooperate with the particular OIG investigation.

DPW did indicate that by participating in the hearing it was not waiving its right to appeal the Commission's reversal of Ms. Edmonds' termination.

"No person who has gained permanent status in the classified state or city service shall be subjected to disciplinary action except for cause expressed in writing."

Subsection (B) of this section provides:
Each city commission established by Part I of this Article shall have the exclusive power and authority to hear and decide all removal and disciplinary cases, with subpoena power and power to administer oaths. It may appoint a referee to take testimony, with subpoena power and power to administer oaths to witnesses. The decision of a commission shall be subject to review on any question of law or fact upon appeal to the court of appeal wherein the commission is located, upon application filed with the commission within thirty calendar days after its decision becomes final.

The Commission's first report also cited Ms. Edmonds' apparent lack of awareness that she could be disciplined for her conduct as a mitigating factor. We agree with DPW that such a consideration is of limited, if any, value.